IN THE UNITED STATED DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| UNITED STATES OF AMERICA, | ) |
| --- | --- |
| Plaintiff, | ) |
| v. | ) C.A. No. 11-16-GMS |
| JOSE MARTINEZ, | ) |
| Defendant. | ) |

## MEMORANDUM

### I. INTRODUCTION

On April 26, 2011, the Grand Jury for the District of Delaware indicted the defendant, Jose Martinez ("Martinez"), on two counts of knowingly, intentionally and unlawfully obstructing, delaying or affecting commerce by robbery in violation of 18 U.S.C. § 1951, and two counts of knowingly carrying, using, or brandishing a firearm in furtherance of a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A). (D.I. 23.) Presently before the court is Martinez's Motion to Suppress Evidence. (D.I. 27.) The court held an evidentiary hearing in connection with this motion on March 15 and 19, 2012 (see D.I. 64, 68), after which the parties submitted briefing. (D.I. 70-74.) For the reasons that follow, the court will deny Martinez's motion to suppress.

### II. FINDINGS OF FACT

At the evidentiary hearing, the Government called six witnesses: (1) Fernando Herrera-Rojas ("Rojas") an employee of Aberrotes Guerrero Grocery Store; (2) McKenzie Kirlin ("Kirlin"), a detective in the Major Crimes Unit of the Wilmington Police Department ("WPD");

1

(3) Gary Tabor ("Tabor"), a detective in the Major Crimes Unit of the WPD; (4) Veronica Hnat ("Hnat"), a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives; (5) Faith Nunez ("Nunez") a contract linguist for the Federal Bureau of Investigation; and (6) Michael William Hayman ("Hayman") an officer with the WPD. (D.I. 64, 68.) The defense called six witnesses: (1) Hector Tabron ("Tabron") an officer with the WPD; (2) Stephanie Castellani ("Castellani") an officer with the WPD; (3) Damian Padilla ("Padilla"), an inmate at the James T. Vaughn Correctional Center in Smyrna, Delaware; (4) Citlalli Morales ("Citlalli"), Rojas's stepdaughter; (5) Angelica Morales ("Morales"), Rojas's wife and owner of Aberrotes Guerrero Grocery Store; and (6) Thomas Mauriello ("Mauriello"), a professor in the Department of Criminology and Criminal Justice at the University of Maryland. (D.I. 64, 68.) The following represents the court's essential findings of fact as required by Rule 12(d) of the Federal Rules of Criminal Procedure.

### A. The Robbery – September 9, 2010

On the evening of September 9, 2010, Rojas was working at Aberrotes Guerrero, a corner store in Wilmington that specializes in Mexican products. (Transcript of Hearing from March 15 and 19, 2012 ("Tr.") at 8-10.) Morales, Rojas's wife, had taken her eldest daughter home, while the other two children were in the back of the store, in a separate area, watching television. (Tr. at 10.) Rojas was at the front counter, close to the store's entrance. (Tr. at 12.)

At around 8 p.m., a man entered the store, wearing a black hooded jacket with a handkerchief covering his face (hereinafter "Robber #1"). (Tr. at 12-13.) Shortly thereafter, a second man came in who was wearing similar clothing as Robber #1 and was carrying a gun (hereinafter "Robber #2"). After entering, Robber #1 came around the counter to the cash

2

register where Rojas was standing while Robber #2 stayed on the other side of the counter, about 10 to 15 feet away. One of the robbers then told Rojas to "open the register." (Tr. at 14.)

Fearing for his children's safety, Rojas looked towards the back of the store and saw that the older child had picked up his infant sister and began to exit the back of the store upstairs to the second floor, where there was a separate room. (Tr.at 15.) At that point, Rojas's fear "turned into adrenalin" and he decided to fight the two men. (Tr. at 69-70.) In fact, Rojas believed that Robber #2's gun was a toy, since he had not used it. (Tr. at 16, 52-53.)

Rojas then grabbed Robber #1 around the neck, which led to a struggle, causing the two to topple over on top of Robber #2. (Tr. at 16.) Robber #1 was able to break loose, and ran outside of the store. (Tr. at 17.) Rojas, however, was able to stay on top of Robber #2, grabbing him around the chest. (Tr. at 17.) As the two wrestled, Robber #2 was able to drag himself to the front door. Once there, Robber #1 returned to the scene—with his mask now removed—and attempted to kick Rojas. Once Robber #1's kick missed its target and he fled again, Rojas got to his feet, dragged Robber #2 out of the store, and attempted to lock the door behind him. (Tr. 17-18.) However, before Rojas could lock the door, Robber #2 attempted to reenter the store and fired a shot from the handgun into the store prior to fleeing. (Tr. at 18-19.)

During the encounter, Rojas had two opportunities to view Robber #2's face. First, during the struggle, Rojas saw Robber #2's profile, as his mask had fallen down from his face. (Tr. at 20-21, 42-43.) At this point, the two were approximately one foot away from each other and in a well-lit area. (Tr. at 18-21, 42-43.) Shortly thereafter, Rojas was able to see Robber #2's "full face" when the two were facing off at the door of the store, and Robber #2 fired the weapon. (Tr. at 20, 47.) At that point, Robber #2 was on the steps leading up to the front door of the store, an area that Rojas characterized as lit by the store's interior lighting, a sign above

3

the store, as well as ambient light from the streetlights and passing vehicles. (Tr. at 20, 47, 79-81.)

At the evidentiary hearing, Rojas positively identified the defendant as Robber #2 and indicated he was "100-percent sure" of his identification. (Tr. at 21-22.)

## B. The Initial Police Response

Shortly after the robbery, the police arrived and began asking Rojas questions about the incident. (Tr. at 20.) Rojas, a native of Jalisco, Mexico, only spoke "a little bit" of English and found it "very difficult" to communicate with them. (Tr. at 6, 22.) Indeed, even after a police interpreter arrived, Rojas found it difficult to communicate with him, and later determined that he was not understanding him. (Tr. at 63.) In describing Robber #2, Rojas recalled that he described him as "negro." (Tr. at 23-24.)

One of the WPD officers that responded to the scene was Patrolman Tabron. (Tr. at 201.) Tabron had been on the job for less than a month, and although his recollection of the event was somewhat hazy, at the evidentiary hearing Tabron recalled interviewing Rojas first through the victim's "broken English," then through a young boy, and later through another WPD Officer who spoke Spanish. (Tr. at 205, 208-09, 237.) At the evidentiary hearing, Tabron recalled that Rojas described one of his attackers as "negro," about 5'5", and wearing a black hooded jacket and pants. (Tr. at 208-09.) In his report, Tabron chronicled Rojas's description of Robber #2 as "a black male, late teens, approximately five-five, average to stocky build, wearing all black clothing, which was a black hooded sweatshirt and black jeans." (Tr. at 120.) Tabron testified that he referred to Robber #2 as "black" because he, through the officer who was interpreting, understood "negro" to refer to an African-American person.[1]

---

[1] Substantial testimony was taken regarding the proper translation of Rojas's use of the word "negro" in his description of Robber #2. The Government contends that Rojas intended to convey that Robber #2 was dark

4

## C. The First Photo Array – September 15, 2010

The WPD ultimately assigned Detective Kirlin to investigate the robbery at the Aberrotes Guerrero store. At that time, Kirlin had been with the WPD for eight years, but had only been in the Detective Division for less than a month. (Tr. at 89, 92.) Given her recent tenure in that division, she was assigned a Field Training Officer ("FTO"), Detective Tabor, to act as her mentor and to further train her. (Tr. at 90-91, 156.) Detective Tabor had been a detective for eight years, and in addition to his academy and on-the-job training, he has attended seminars regarding homicide investigation, as well as interview and interrogation techniques. (Tr. at 155.)

On September 15, 2010, Kirlin developed two suspects for the robbery—Brian Francisco and Jose Martinez—from a call that came into the Detective Division. (Tr. at 92.) That same day, two photo arrays were prepared: one containing a photograph of Brian Francisco and five "fillers"; the other containing a photograph of Jose Martinez and five fillers.[2] Tabor prepared the photo array for Martinez using PhotoShop CS-5.[3] During his career, Tabor has assembled close to a thousand photo arrays. (Tr. at 156.)

---

skinned but not necessarily African-American. To support this contention, the Government elicited testimony from Faith Nunez—a contract linguist for the FBI and a certified Federal Court interpreter for Spanish and English—who stated that when used by individuals from Mexico, the word "negro" refers to a person who is darker skinned, not a person of African-American descent. (Tr. at 187-88, 191-92, 196.) The court finds this testimony to be credible and notes that WPD Patrolman Michael Hayman, who was the officer who translated for Officer Tabron that night, is not certified as a translator and has not taken any tests to determine his Spanish proficiency. (Tr. at 248.) Hayman testified that Rojas used the words "el negro" to describe one of the "bandits," which he understood to be a "common word for black." (Tr. at 239.) He therefore interpreted the suspect as being "black" to his fellow officers. (Tr. at 244.) He could not recall if he attempted to clarify whether the victim meant a person of "darker skin color" or a person of African-American descent. (Tr. at 244-45.)

[2] A "filler" is a photograph of an individual other than the target suspect that is selected based on its similarities to the suspect, such as facial features, eye color, and hair. (Tr. at 97-98, 159.) The Government's Exhibit 9, a U.S. Department of Justice publication entitled "Eyewitness Evidence: A Guide for Law Enforcement" states, "Consider that complete uniformity of features is not required. Avoid using fillers who so closely resemble the suspect that a person familiar with the suspect might find it difficult to distinguish the suspect from the fillers." (Tr. at 334, Ex. 9 at 29.)

[3] Since Martinez had a tattoo on his face, in order to make sure that the photo of Martinez did not stand out in the array, Tabor used the PhotoShop program to remove the tattoo from the photograph. (Tr. at 100, 157-58.)

5

Kirlin and Tabor then drove to the Aberrotes Guerrero Store, where they met with Rojas. (Tr. at 101.) Prior to the meeting, the detectives did not realize that Rojas did not speak English, since the report from patrol did not so indicate. Since they did not have an interpreter with them, they opted to have Rojas's daughter translate while they conducted a brief inquiry regarding the photo arrays. (Tr. at 102.)

Tabor told Rojas's daughter to advise Mr. Rojas that they were going to show him "some photographs," and to ask him "if he recognized anyone in the photo lineup." (Tr. at 102-03, 160.) Based on his experience, Tabor used this phraseology to avoid being suggestive. (Tr. at 161.) Moreover, prior to showing the photo arrays, neither detective told Rojas that they had made an arrest in the case, or that they had a suspect included in the photo array. (Tr. at 108-09.)

First, the detectives showed Rojas the photo array containing Brian Francisco's picture. (Tr. at 103-04.) After Rojas identified the photograph of Francisco as one of the robbers, one of the detectives circled Francisco's picture and Kirlin, as well as Rojas, initialed the selection. (Tr. at 104-05.)

Tabor then showed Rojas the second photo array, and asked him if he recognized anyone. (Tr. at 105.) Rojas pointed at the picture of the defendant and indicated that it was "possibly" one of the robbers, but he could not be sure. (Tr. at 107.) Rojas also indicated that the photograph of the defendant, which was in the third position in the photo array, was similar to the photograph of Pablo Melendez, the man whose photograph was in the array's first position. (Tr. at 107-08.) At that time, Rojas viewed the photo array for approximately thirty seconds. (Tr. at 171.)

**D. The Second Photo Array – September 22, 2010**

6

Shortly after her first meeting with Rojas, Detective Kirlin used the same photo array containing the defendant in a separate armed-robbery investigation. (Tr. at 110.) In viewing the photo array, two other witnesses had difficulty choosing between the photographs of the defendant and Pablo Melendez—the same two photographs that Rojas described as being "similar" in their depictions of the two men's facial features. (Tr. at 108, 110-11, 147.) Since three different robbery victims were torn between the photographs of the defendant and Pablo Melendez, Detectives Kirlin and Tabor determined that the facial features of the two suspects were "too similar." (Tr. at 147.)

In order to alleviate the confusion, Tabor created a new photo array that still included a photo of the defendant, but replaced the photograph of Pablo Melendez with a different filler.[4] (Tr. at 111, 147-48.) In this new array, Tabor moved the defendant's position in the array from the number three position to the number one position, but kept the other fillers where they were. (Tr. at 112-13.) Tabor understood that this photo arrangement could be viewed as suggestive to some degree, but considered it to be preferable to replacing all of the filler photos, and thus having the defendant's picture be the only common photograph in the two arrays that were shown to Rojas with regard to Robber #2. (Tr. at 171.) Tabor also concluded that replacing Melendez's picture and asking Rojas if he could make an identification a second time was better than skipping the second identification altogether and possibly missing out on evidence that could solve the crime. (Tr. at 171.)

Therefore, on September 22, 2010—a week after showing him the initial photo arrays—Kirlin met with Rojas again at his store, and using Rojas's wife as a translator, asked him if he recognized anyone in the new photo array. (Tr. at 114-16.) In this meeting too, Kirlin refrained

---

[4] The court notes that Melendez himself was not a suspect in the Aberrotes Guerrero robbery because he was incarcerated at the time of the incident. (Tr. at 111, 164.)

7

from telling Rojas whether or not the police had made an arrest, or whether one of the robbers was in the photo array.[5] (Tr. at 117.) After seeing the new photo spread, Rojas immediately identified the defendant as one of the robbers. (Tr. at 116.)

When the defendant was arrested the following day, on September 23, 2010, Kirlin had the opportunity to view him and she estimated him to be about 5'6" tall, of average build, and to be in his mid-twenties. (Tr. at 126-27.)

### III. CONCLUSIONS OF LAW

In his motion, Martinez seeks to suppress his out of court, and any potential in court, identification by Rojas. (D.I. 27.) Specifically, Martinez contends that these identifications should be suppressed because the "procedures and tactics utilized by the Wilmington police department, in this instance, have created a witness identification that was unduly suggestive and tainted by multiple seeds of suggestiveness at every level of the investigation. As such, there is no way to properly balance a potential in court identification made by Fernando Rojas against the out of court identification he provided, because so much is based on tainted fruit which was caused by law enforcement." (D.I; 70 at 9.)

The Government, on the other hand, argues that Martinez's motion is without merit and should be denied. Specifically, it contends that the detectives did not use "unnecessarily suggestive" identification procedures. (D.I. 71 at 2.) It further contends that Rojas had a face-to-face encounter with his attacker in a lighted area, provided the police with a description that generally matched the defendant, and specifically identified the defendant two weeks after the robbery. (*Id.*) Therefore, according to the Government, irrespective of the procedures employed by the detectives, Rojas's identification of the defendant was reliable. (*Id.*) The Government

---

[5] Shortly after being shown the second array, Rojas was shown a separate photo array with six other Hispanic males, one of which was also a suspect in the investigation. (Tr. at 117-18.) When asked whether he recognized anyone in that array, Rojas responded that he did not. (Tr. at 119.)

8

continues, the defendant's challenges are proper "grist for the jury's mill," but do not give rise to a violation of the defendant's rights to Due Process. *United States v. De Leon-Quinones*, 588 F.3d 748, 755 (1st Cir. 2009).

The Supreme Court has recently held that generally speaking, it is the "province of the jury to determine" whether evidence is reliable. *Perry v. New Hampshire*, 132 S.Ct. 716, 720 (2012). Indeed, even in cases of evidence of "questionable reliability," the Constitution "protects a defendant" not by prohibiting introduction of the evidence, but by "affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit." *Id.* at 723. It is only when evidence is "so extremely unfair that its admission violates fundamental conceptions of justice" that the Constitution's Due Process comes into play. *Id.* at 723.

Similar to other parts of the prosecution's case, the credibility of an eyewitness is typically a matter for the jury to consider in light of a number of procedural safeguards. *Perry*, 132 S.Ct. at 721. However, an exception to this rule occurs "[w]hen a witness identifies the defendant in a police-organized photo lineup," and "'the photographic identification procedure was so [unnecessarily] suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" *Id.* at 724 (quoting *Simmons v. United States,* 390 U.S. 377, 384 (1968)).

To determine if this exception applies, courts employ a two-step inquiry. First, the defendant bears the initial burden of demonstrating that the identification procedure in question was "unnecessary" and "suggestive" enough to violate the defendant's right to due process. *Id.* If the defendant is able to meet his burden, the court proceeds to the second step to determine whether the defendant has established that the lineup procedure created a "very substantial likelihood of irreparable misidentification." *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977).

### A. Whether the Identification Procedures Utilized Were Unnecessarily Suggestive

9

The first step of the court's analysis is to determine whether the defendant has established that the lineup procedures in question were unnecessarily suggestive. *Perry*, 132 S.Ct. at 724. "An identification procedure is impermissibly suggestive when, 'in effect it says to the witness "This is the man."'" *Evans v. Phelps*, No-10-92-LPS, 2012 WL 1134482 (D.Del. Apr. 2, 2012) (quoting *Foster v. California*, 394 U.S. 440, 443 n.2 (1969)); *see also United States v. Lawrence*, 349 F.3d 109, 115 (3d Cir. 2003) ("[S]howing a witness a photograph array can constitute a denial of due process when police attempt to emphasize the photograph of a given suspect, or when the circumstances surrounding the array unduly suggest who an identifying witness should select."). Furthermore, a suggestive identification procedure is "unnecessary" if law enforcement does not have "some good reason for the failure to resort to less suggestive procedures." *United States v. Stevens*, 935 F.2d 1380, 1389 (3d Cir. 1991).

### 1. *The September 15, 2010 Photo Identification*

Martinez asserts that the identification procedure WPD used on September 15, 2010, was unnecessarily suggestive. He contends this is so because when the detectives presented the array containing the defendant's photograph to Rojas, they did not specifically instruct him that "person(s) who committed [the] robbery did not have to be in the photo array." (D.I. 70 at 12.) Relying on the testimony of his expert witness, Mr. Thomas Mauriello, Martinez argues that such an instruction is required in order to "avoid suggestiveness" when using a photo array.[6] (*Id.* at 11.) The court disagrees.

Mr. Mauriello relied on a 1999 publication by the Department of Justice entitled "Eyewitness Evidence: A Trainer's Manual for Law Enforcement" (hereinafter, "the Guide").

---

[6] The court does not find Mr. Mauriello's testimony to be generally credible. It is worth noting that Mr. Mauriello's own treatise, Criminal Investigation Handbook: Strategy, Law and Science, does not indicate that such an instruction is required, or even recommended. (Tr. at 339.) Furthermore, Mr. Mauriello proved himself to be unfamiliar with even routine police interrogation procedures and testified that he was last employed by a police department thirty years ago. (Tr. at 329-31; 287.)

10

While the Guide does suggest that prior to presenting a photo array to a witness, an investigator should instruct the witness that the perpetrator "may or may not be" in the set of photographs that he will see, it does not state that without this instruction, a photo array is suggestive. Furthermore, the Guide makes clear that it does not "state legal criteria for the admissibility of evidence" in any regard. (Tr. at 332.)

The court finds no evidence to indicate that the September 15, 2010 identification procedure emphasized the photograph of the defendant. As Mr. Mauriello acknowledged, the detectives complied with every single one of the Guide's eleven best-practice suggestions to ensure that the array itself was not suggestive. (Tr. at 333-36.) Furthermore, the question posed to the victim—"do you recognize anyone in this photo lineup" (Tr. at 103)—did not suggest that he identify the defendant, or for that matter, any other photograph in the array. *See, e.g., United States v. Pierce*, No. 11cr08-WKW, 2012 WL 1030465, at *2 (M.D. Ala. Mar. 9, 2012) (holding that there was nothing impermissibly suggestive when agent showed photo array to witness and asked her "if she recognized anyone from the home invasion" without providing curative instruction that the perpetrator may not be in the array.) Accordingly, Martinez has not met his burden of establishing that the September 15, 2010 identification procedure was unnecessarily suggestive. *Phelps*, 2012 WL 1134482 at *13.[7]

### 2. *The September 22, 2010 Photo Identification*

---

[7] The court notes that the defendant also claims that by using two of Rojas's family members as translators, the detectives "undermined any reliability" in the identification process. (D.I. 73 at 4.) The defendant's argument is misplaced for several reasons. First, there is no evidence that either translator affected Rojas's decision to identify the defendant. In fact, his wife testified that during the interview she "tried to keep [herself] back a bit" because she did not "want to interfere." (Tr. at 279.) Furthermore, the reliability of the police procedure is not at issue here. Rather, the issue before the court is whether Rojas's identification of the defendant was "reliable—namely, whether he was able "to make an accurate identification" *despite* the identification procedures used by law enforcement. *Perry*, 132 S.Ct. at 725. This inquiry focuses on factors largely independent of the identification procedures themselves. *Id.* at 725 n.5.

11

Martinez also contends that the identification procedure Detective Kirlin used on September 22, 2010, was unnecessarily suggestive. Specifically, when the detectives presented the first photo array a week before, Rojas indicated that the photograph of the defendant was "potentially" one of the men who robbed him, but that he was unsure because another person in the array – Pablo Melendez—had facial features similar to the defendant's. (Tr. at 108.) Accordingly, by presenting the victim with a subsequent photo array that replaced Melendez's photograph with a different filler, Martinez contends that the new array was unnecessarily suggestive. Martinez further argues that the suggestiveness of this procedure was exacerbated by not replacing the other filler photos in the array.

In response to this point, the Government admits that "[t]he defendant's argument here is not without some force. Indeed, the government does not dispute that the September 22, 2010, photo array was suggestive to some degree." (D.I. 71 at 13.) The Government argues, however, that the procedure was not suggestive as a matter of law, i.e., the detectives did not implicitly tell Rojas that the defendant was "the man." *Stevens,* 935 F.2d at 1389; *Phelps,* 2012 WL 1134482 at *13. The court agrees.

Although the second photo array was suggestive to some degree, Martinez has not demonstrated that it was *unnecessarily* suggestive under the circumstances. *Stevens,* 935 F.2d at 1389. It is worth noting that based on the feedback of two different witnesses in a separate armed robbery investigation, the detectives believed that the photographs of the defendant and Melendez were "too similar." (Tr. at 147.) As a result, they had a reasonable basis to conclude that Rojas's failure to conclusively identify the defendant on September 15, 2010, stemmed from the inclusion of both of these photographs in the same array. In light of these circumstances, it was reasonable for the detectives to construct a new photo array, where a different filler was

12

used in place of the photograph of Melendez. The court also finds this procedure to be reasonable since the defendant's photograph was moved to a different position in the array, and the detectives waited a week to present the new lineup to Rojas.

Other courts have concluded that showing a witness two separate photo arrays—both of which contain a photograph of the defendant—does not in and of itself offend due process. *See, e.g., United States v. Harris*, 281 F.3d 667, 670 (7th Cir. 2002) ("[T]here is nothing per se impermissible about placing the same subject in two different identification procedures."); *United States v. Maguire*, 918 F.2d 254, 263 (1st Cir. 1990) ("A suspect's inclusion in two photospreads, even with the same photo, is not constitutionally impermissible."); *see also United States v. Diaz*, 248 F.3d 1065, 1103 (11th Cir. 2001) (affirming district court's finding that identification procedures were not unnecessarily suggestive where witnesses were shown different photo arrays on two different occasions weeks apart and presented a separate photo array six months later with a different picture). In *United States v. Eatherton*, 519 F.2d 603 (1st Cir. 1975), after a witness indicated two to four "possibilities" of a suspect from one photo album, the agents removed all of the other "possibilities" save the photo of the defendant, and had the witness look through the album again the same day. *Id.* At that point, the witness identified the defendant. *Id.* The First Circuit affirmed the district court's finding that this procedure was not unduly suggestive since, like the case here, the agents did not specify which photo to select, and the resulting identification was an "independent decision made without difficulty." *Id.* at 608. The court finds the First Circuit's holding in *Eatherton* to be persuasive, particularly given the similarity between the facts in that case and those here.

### B. Whether the Identification Procedures Used Created a Very Substantial Likelihood of Irreparable Misidentification

13

For the reasons articulated above, Martinez has not met his burden to establish that the identification procedures used in this case were unnecessarily suggestive. Nonetheless, even assuming that Martinez could make such a showing, he has not demonstrated that the identification procedures at issue created a "very substantial likelihood of irreparable misidentification." *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977).

In determining whether a suggestive identification has corrupted a witness's ability to make an accurate identification, the court's analysis is guided by the five factors identified by the Supreme Court in *Neil v. Biggers*, 409 U.S. 188 (1977), namely: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of his prior description of the criminal; (4) the level of certainty demonstrated at the confrontation; and (5) the amount of time elapsed between the crime and the confrontation. *Id.* at 199-200. In weighing the totality of the circumstances, if the "indicators of [a witness's] ability to make an accurate identification" are "outweighed by the corrupting effect" of law enforcement's suggestion, the identification should be suppressed. *Perry*, 132 S.Ct. at 725 (quotations omitted). Otherwise, the evidence should be submitted to the jury. *Id.*

Here, the so-called *Biggers* factors weigh strongly in favor of denying Martinez's motion. First, Rojas had a good opportunity to view his attacker. Rojas testified seeing Robber #2's face twice during the robbery—once from approximately one foot away in a well-lit area (Tr. at 18-21, 42-43), and again when Robber #2 was outside near the front door when they were about ten feet apart. (Tr. at 20, 47.) Next, Rojas arguably had a high degree of attention during the robbery. Rojas provided a detailed account of the robbery during his testimony. While his attention may have been initially focused on the safety of his children, Rojas had two opportunities to view Robber #2's face *after* he saw that his children had gone upstairs. (Tr. at

14

37-38, 69-70.) Third, as noted earlier, the defendant fits Rojas's description of Robber #2. Rojas initially described Robber #2 as "a black male, late teens, approximately five-five, average to stocky build, wearing all black clothing." (Tr. at 120.) At the time of the robbery, the defendant was nineteen years old, approximately 5'6'' tall, and of average build. (Tr. at 125-27.) Moreover, Rojas explained that when he referred to Robber #2 as "black," he used the Spanish word "negro" which means a person who is dark-skinned, not African-American. (Tr. at 23-24, 187-88, 191-92, 196.) *See supra* note 1. Fourth, Rojas positively identified Martinez on two occasions. Both during the second photo array on September 22, 2010, and in open court at the evidentiary hearing, Rojas identified Martinez without hesitation. (Tr. at 21-22, 118.) Although Rojas displayed some reluctance to select Martinez during the September 15, 2010, array, he indicated that the defendant was a possibility, but thought that another individual in the array had similar facial features. However, two other witnesses, in a separate robbery investigation, commented that the photographs of the defendant and this other individual were very similar. (D.I. 71 at 17.) Lastly, Rojas identified Martinez as possibly Robber #2 a week after the robbery (September 15, 2010). He then definitively selected the defendant as the perpetrator a week later, on September 22, 2010. Therefore, the court finds that the *Biggers* factors do not weigh in favor of suppressing Rojas's identification of the defendant.

## IV. CONCLUSION

For the foregoing reasons, the court will deny the defendant's motion to suppress.

Dated: July **25**, 2012

_____
CHIEF, UNITED STATES DISTRICT JUDGE

15

IN THE UNITED STATED DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 11-16-GMS |
| | ) | |
| JOSE MARTINEZ, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY

ORDERED THAT:

1. The defendant's motion to suppress evidence (D.I. 27) is DENIED.

Dated: July 25, 2012

CHIEF, UNITED STATES DISTRICT JUDGE